John Henry WILKINS, Jr.

v.

J. L. SUMNER, Warden, Tazwell
Correctional Center.

Civ. A. No. CA78–0624–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 8, 1979.

John D. Grad, Alexandria, Va., for plaintiff.

Robert H. Herring, Jr., Asst. Atty. Gen. of Va., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

John Henry Wilkins has brought this habeas corpus petition pursuant to 28 U.S.C. § 2254 attacking his conviction on September 17, 1976 in the Circuit Court of Henrico County, Virginia for armed robbery and use of a firearm in the commission of a felony. As a result of his conviction petitioner was sentenced to twenty-five (25) years imprisonment on the first charge and one (1) year on the second. The court later suspended fifteen (15) years from the longer sentence.

Petitioner asks this Court to set aside his conviction, alleging that his representation by counsel was ineffective and that his in-court identification by two witnesses was based upon impermissibly suggestive photographic line-ups. Jurisdiction is proper under 28 U.S.C. § 2241. The Court has reviewed the state court records, counsel have submitted memoranda, the Court has held an evidentiary hearing, and the matter is thus ripe for disposition. For the reasons set out below, the petition will be denied.

The state court records and the evidence adduced at the evidentiary hearing reveal the following pertinent facts. Shortly after 6:00 P.M. on Saturday, February 14, 1976, a liquor store in Henrico County, Virginia was robbed of approximately Forty-Six Hundred Dollars ($4,600.00). The store manager, Mr. D. G. Phillips, called the police soon after the robber left. Among the officers who responded to the call was Detective R. K. Harless, whose notes reflected that Mr. Phillips described the robber as a black male, twenty to thirty years old, five feet, eight inches to six feet tall, approximately 170 pounds, medium build, light complexion, slight moustache, wearing a blue stocking cap with two stripes around the bottom, a waist-length brown plastic coat, and blue jeans, and carrying a blue steel revolver.

There is no doubt that Mr. Phillips had ample opportunity to observe the robber. They were face to face several times over a period of several minutes. The store was well lighted, and the robber wore no mask. Moreover, Mr. Phillips testified that he had been robbed three times before at gunpoint. Because he had spent thirty-three years as a military policeman in the Army, the detailed nature of his description is hardly surprising.

After the robber left, a fifteen year old girl named Brenda Lee Baker, who was in the vicinity of the liquor store, saw a young woman with frizzy hair meet a black man wearing a shiny imitation leather jacket, jeans, and a dark hat. Miss Baker's opportunity to observe these individuals was somewhat fleeting, and it was relatively dark. About fifteen minutes later, however, she thought she saw the same pair outside a nearby grocery store. She then observed them get into a small red car that had black and orange tags and looked like a Chevrolet Nova. This information was also conveyed to Detective Harless on the day of the robbery.

On the afternoon of Monday, February 16, 1976, two days after the robbery, Detective Harless was continuing his investigation at the shopping center where the robbery occurred when he observed a red Capri pull into the parking lot. The car had New York tags, which are orange and black, and was occupied by petitioner and a white woman with frizzy hair named Mary Ann Babstock. Soon thereafter, Detective Harless arrested them, took them to the police station, and photographed them. He then called Mr. Phillips and Miss Baker to the station, apparently telling Mr. Phillips that he had a suspect.

Both Mr. Phillips and Miss Baker were shown a photographic array consisting of petitioner's photo and those of three other black men scotch taped in a manila folder. One of the men pictured was at least six feet, five inches tall with a full beard. Of the other two, one had a moustache and goatee, and the other appeared to have a

light beard. Petitioner's picture depicts a slight moustache and what looks like a "five o'clock shadow." Mr. Phillips identified petitioner without hesitation, and Miss Baker said she thought petitioner was the man she had seen, but she was not positive. Miss Baker was then shown a photographic array of four women, one of whom was Ms. Babstock. Ms. Babstock was the only woman with frizzy hair, and Miss Baker identified her without difficulty. Petitioner and Ms. Babstock were then formally charged with the robbery.

On this basis, Detective Harless obtained a search warrant for petitioner's apartment. At the apartment were found one black knit stocking cap with two circular stripes and a man's vinyl waist-length jacket. Neither the gun allegedly used nor the money stolen was ever recovered.

Petitioner retained a local attorney to represent him, and Ms. Babstock had court-appointed counsel. At a preliminary meeting with petitioner, his counsel offered to represent them both for a somewhat reduced fee. Petitioner and Ms. Babstock agreed, and her court-appointed lawyer was released.

At the trial of petitioner, some eight months later, both Mr. Phillips and Miss Baker identified petitioner, who was seated in the audience rather than with his defense counsel. Both identifications were prefaced by testimony that they had also selected petitioner from the photographic array two days after the robbery. These witnesses also recognized the stocking cap and jacket seized at petitioner's apartment by Detective Harless. Moreover, Miss Baker testified that she had identified Ms. Babstock at the photographic line-up. The trial transcript shows Miss Baker to have been a much weaker witness than Mr. Phillips.

Petitioner testified in his own defense— asserting an alibi. His counsel, however, chose not to call Ms. Babstock even though she was available to testify and had indicated that she would corroborate petitioner's version in all pertinent respects. The Commonwealth called her as a rebuttal witness, and she did indeed support petitioner's contention.

Much of the trial transcript reflects defense counsel's vigorous efforts to suppress the in-court identification of petitioner by Mr. Phillips and Miss Baker. Much was made of the alleged suggestiveness of the photographic array, with particular emphasis upon whether the robber had a moustache, a beard, or a "scraggly" growth of a couple of days. Other testimony established that petitioner worked at IBM and, under company rules, had to be clean-shaven. The trial judge refused to suppress the identification, and found petitioner guilty as charged. Subsequent to petitioner's conviction, defense counsel urged Ms. Babstock to negotiate a plea to a lesser offense, fearing that petitioner's conviction did not bode well for her. She did so, but "with reservation," continuing to deny her guilt.

In his petition for habeas corpus before this Court, petitioner asserts first that his defense counsel's joint representation of petitioner and Ms. Babstock operated to divide his attorney's loyalty and deprive petitioner of effective assistance of counsel. Second, petitioner argues that the trial judge's failure to suppress his in-court identification by Mr. Phillips and Miss Baker rested upon an impermissibly suggestive photographic array and was therefore constitutional error.

With respect to petitioner's assertion that he was deprived of effective assistance of counsel, the United States Court of Appeals for the Fourth Circuit has identified the general inquiry as follows: "Was the defense counsel's representation within the range of competence demanded of attorneys in criminal cases?" *Marzullo v. Maryland*, 561 F.2d 540, 543 (4th Cir. 1977). Here petitioner is not so much attacking his trial counsel's competence as he is questioning whether his lawyer's joint representation may have, by dividing counsel's loyalty, reduced his freedom zealously to protect petitioner's interests.

The seminal case in this narrower context is the Supreme Court's decision in *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86

L.Ed. 680 (1942). *Glasser* involved a conspiracy trial at the commencement of which petitioner Glasser's attorney was appointed by the trial judge to also represent an alleged co-conspirator. *Id.* at 69, 62 S.Ct. 457. All five defendants, in that case, were tried jointly, and because the Court perceived a divergence of interests between Glasser and the other defendant who was represented by Glasser's attorney, the Court concluded that Glasser's conviction must be set aside, holding that: "[T]he 'assistance of counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammelled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." *Id.* at 70, 62 S.Ct. at 465; *cf. Goodson v. Peyton*, 351 F.2d 905, 908 (4th Cir. 1965).

Two aspects of *Glasser* assume special import in the instant case. First, the defendants in *Glasser* were tried jointly. Here of course, petitioner was tried alone. Second, the rule established in *Glasser* was not a *per se* rule. In its most recent application of *Glasser*, the Supreme Court noted that: "One principle . . . emerges from *Glasser* without ambiguity. Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978).

■ The precise question before this Court, therefore, is whether in the circumstances of this case, where petitioner was tried alone, petitioner's representation by counsel failed to satisfy the requirements of the Sixth Amendment. In this regard, the decisions of the Supreme Court, as well as those of the United States Court of Appeals for the Fourth Circuit, require a subtle analysis of the relationship between the respective interests of petitioner and Ms. Babstock. In order to prevail, petitioner must establish that his interest conflicted with that of Ms. Babstock to such a degree that his defense counsel's concern for her diluted his loyalty to petitioner. Because the Court

has concluded that no true conflict existed, petitioner's argument must fail on this point.

■ A reading of the transcript as well as consideration of the evidence adduced before this Court reveal quite clearly that, in all significant respects, no conflict existed between the interests of petitioner and Ms. Babstock. Both steadfastly have maintained their profession of innocence. Their alibi, that they were shopping nearby at the time of the robbery, was asserted by them both with only minor inconsistencies. Petitioner now faults his trial counsel's decision not to cross-examine Ms. Babstock rigorously about these inconsistencies. In the Court's view, however, it would have been a tactical mistake to assail a witness on cross-examination whom the Commonwealth had called on rebuttal and who fully supported the critical portion of petitioner's own defense.

That petitioner's trial counsel chose not to call Ms. Babstock is initially somewhat disturbing, especially in light of her rebuttal testimony that, in its most significant aspect, was so strongly corroborative of petitioner's position. And yet the Court is reluctant to second guess too closely decisions made by counsel in the heat of trial. It is significant that Ms. Babstock was available to be called by the Commonwealth on rebuttal not because the Commonwealth's Attorney had subpoenaed her, but because petitioner's counsel anticipated that he might call her. Why he opted not to call her is not fully clear. At the time of trial, the record reflects that he explained that he could not put her on the stand prior to her own trial. But, as the learned trial judge noted, Virginia law apparently would have protected her from anything incriminating that she might have said. *See* Va.Code Ann. § 19.2–270. At the evidentiary hearing before this Court, petitioner's counsel testified that his decision not to call Ms. Babstock was at least partially based upon his conclusion that she would not have made a very good witness. He recalled not only that she was excitable but also that she was taking Valium during petitioner's

trial. In any event, the Court is satisfied that counsel's decision not to call Ms. Babstock was not a product of any unconstitutional division of loyalty. On the contrary, the record abundantly supports the conclusion that petitioner received counsel's best efforts.

Petitioner has directed the Court's attention to a number of cases, prominent among them being two decisions by the Fourth Circuit See United States v. Truglio, 493 F.2d 574 (4th Cir. 1974); and Sawyer v. Brough, 358 F.2d 70 (4th Cir. 1966). Although both of these cases resulted in reversals of convictions because of joint representations, both may be distinguished on their facts. Truglio involved a conspiracy trial of five defendants, all of whom were represented at their joint trial by one attorney. 493 F.2d at 576. Truglio's conviction was set aside because the court found first, that the circumstances of his guilty plea were coercive, and second, that the coercion was a product of the joint representation by the lone defense counsel. Id. at 580. Counsel's loyalty to the other four defendants prevented him from adequately safeguarding Truglio's interests. There was a direct and substantial conflict that could have been avoided had Truglio enjoyed the services of separate counsel. Id.

In the instant case, however, there was no such conflict. Notwithstanding petitioner's conclusory and speculative allegations of what might have been, the record demonstrates no conflict between the interests of petitioner and Ms. Babstock that in fact operated to dilute the effectiveness of petitioner's representation by counsel in the state courts.

The Sawyer case is similarly distinguishable. There, as in Truglio, but unlike the instant case, the two defendants were tried jointly. 358 F.2d at 71. During the course of trial the state introduced a pretrial confession by Sawyer's codefendant and alleged accomplice. The Fourth Circuit reviewed this confession and determined that it indirectly, though quite clearly in light of all the evidence, implicated Sawyer as the principal culprit in the robbery. Id. at 72–73. The court then noted that an "obvious divergence of interest exists between a defendant who denies his guilt [i. e., Sawyer] and a codefendant who not only confesses his own complicity but also accuses the other of participation in the crime." Id. at 73. Because of this conflict between the respective interests of the two codefendants, the court asserted that it was "utterly impossible for one attorney to effectively serve both of these conflicting interests." Id. This conflict was both real and substantial, unlike the asserted conflict in the instant case.

One last point raised by petitioner on this issue must be addressed. Petitioner asserts that the possibility of one defendant's entering plea negotiations with the prosecution raises the potential for a fatal conflict of interest. In support of this argument, petitioner cites the following language from the Supreme Court's decision last spring in Holloway:

[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible.

435 U.S. at 490–91, 98 S.Ct. at 1182. Petitioner's reliance on the quoted language is, for two reasons, misplaced. First it was clear in Holloway that a conflict among the three defendants did indeed exist. Defense counsel had confidential information from the defendants that he believed would prevent him from fairly representing all three together. He therefore moved the trial court for appointment of separate counsel.

*Id.* at 476–77. His motion was denied, thus raising the question that the Court ultimately resolved by holding it to be error to deny a timely motion for separate counsel in such circumstances. Here, however, there was no conflict, bringing this case perhaps within the ambit of what the Court in *Holloway* contemplated when it noted that: "[I]n some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation. . . . 'A common defense often gives strength against a common attack.'" *Id.* at 482–83, 98 S.Ct. at 1178 (quoting *Glasser v. United States*, 315 U.S. 60, 92, 62 S.Ct. 457, 86 L.Ed. 680 (1942) (Frankfurter, J., dissenting)).

█ The second infirmity with petitioner's selective reliance on *Holloway* is that the rule petitioner implicitly asks this Court to adopt appears to be a *per se* rule forbidding joint representation. Plea negotiation, as a matter of course, is almost always a possibility. That it may be an option in a particular case does not necessarily mean that a conflict of interest will result if codefendants share one attorney. To so hold would be to ignore that portion of *Holloway*, to which this Court has already made reference, that explicitly rejects such a *per se* rule. *See id.* at 482, 98 S.Ct. 1173.

For the foregoing reasons, therefore, the Court has concluded that the instant petitioner was not deprived of his Sixth Amendment right to "effective assistance of counsel." This leaves for the Court's resolution the question of whether the in-court identification of petitioner by two prosecution witnesses should have been suppressed because it was based upon impermissibly suggestive photographic arrays.

The starting point for any analysis of a photographic identification is the Supreme Court's decision in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). There the Court held that:

> [E]ach case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial follow-

ing a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive to give rise to a *very substantial likelihood of irreparable misidentification.*

*Id.* at 384, 88 S.Ct. at 971 (emphasis added). *Simmons* was extremely fact-specific. The Court took great pains to note that the photographic identification there at issue was not fatally tainted. And as the emphasized language suggests, the Court was concerned not with excluding the fruit of wrongful police tactics, which in the Fourth Amendment context usually is very reliable evidence, but rather with ensuring that an innocent man not be convicted.

The Court placed special emphasis first on the need for police to use photographs while a suspect is still at large, second on the speed with which the FBI in this case displayed photographs to the eyewitnesses, and third, on the reduced likelihood of mistake where all five witnesses had ample opportunity to observe the petitioner during the crime. *See id.* at 384–85, 88 S.Ct. 967. Nonetheless, the Court cautioned that:

> [The danger of misidentification] will be increased if the police display . . . pictures of several persons among which the photograph of a single such individual . . . is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.

*Id.* at 383, 88 S.Ct. at 971 (footnotes omitted).

In the instant case petitioner asserts that the police made two mistakes that together raise a substantial question about the reliability of his identification. First, petitioner argues, of the four photos displayed to Mr. Phillips, that of petitioner stands out because the other three show men with more than a two day beard growth, and one of the other three men was at least six feet, five inches tall. Second, petitioner notes that Detective Harless called Mr. Phillips to the station and said he had a suspect. The

inference therefore is that the state's key witness was summoned to the police station, was told that he would be viewing pictures of which one was of the suspect, and then was showed four photographs, only one of which corresponded closely to the description that Mr. Phillips had given the police immediately after the robbery.

■ Despite this suggestiveness, the Court has concluded that, under the totality of the circumstances, there was little likelihood of a misidentification by Mr. Phillips. Mr. Phillips' experience as a military policeman, his having been robbed at gunpoint three other times, his more than ample opportunity to observe the robber, and the speed with which the police displayed the photos to Mr. Phillips, together operate to reduce substantially the chances that he made a mistake.

Petitioner has directed the Court's attention to the decision of the United States Court of Appeals for the Fourth Circuit in *Kimbrough v. Cox*, 444 F.2d 8 (4th Cir. 1971), in which the court set aside a conviction based upon an impermissibly suggestive photographic identification. *Kimbrough*, however, may be distinguished on its facts. There only one photograph was shown to the eyewitness, and it was not displayed until two weeks, as opposed to two days, after the crime, thus increasing the chances that fading memories could have tainted the procedure. *Id.* at 9–10. Moreover, in *Kimbrough* the eyewitness identifications constituted the only evidence at trial linking the defendant with the robbery. *Id.* at 11. In the instant case, although the eyewitness identification was very important, there was also the physical evidence of petitioner's hat and jacket.

More helpful to the Court's analysis than *Kimbrough* is the Supreme Court's more recent decision in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). *Manson* involved a photographic identification procedure that the state conceded was suggestive. *Id.* at 109, 97 S.Ct. 2243. Indeed, the procedure used in *Manson* was arguably more suggestive than in the instant case, for there only one photo-

graph was displayed to the witness. Nonetheless, the Court explicitly rejected a *per se* rule of exclusion in such instances, holding instead that, regardless of the suggestiveness of the identification procedure, "reliability is the linchpin in determining . . admissibility." *Id.* at 114, 97 S.Ct. at 2253. The Court then outlined a totality of the circumstances approach to assessing reliability in which the following factors are to be considered:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Id.*

Weighing these factors in the instant case against "the corrupting effect of the suggestive identification," *see id.*, leaves little doubt about the reliability of Mr. Phillips' identification. He had ample time to study the robber, his attention to detail and the accuracy of his description were good, he never wavered in its identification, and he picked out petitioner's photograph a mere two days after the robbery. Under the totality of the circumstances, therefore, this Court has concluded that admission of the in-court identification of petitioner by Mr. Phillips did not offend constitutional principles of fairness and due process. *See also Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

■ With respect to the identification of petitioner by Miss Baker, were she the only eyewitness the Court might well reach a different conclusion. A careful review of the state court records reveals that Miss Baker was not a very impressive witness. She clearly was more vulnerable to a suggestive identification procedure. Her age, her inconsistent memory, her relatively poor opportunity to observe the robber, and her uncertainty when showed the four photographs all lead the Court to believe that her testimony alone might not have been

very reliable. In light of the other evidence introduced against petitioner, however, especially the very effective testimony of Mr. Phillips, the Court has concluded that any error in admitting Miss Baker's identification was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).